**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| |
|---|
| UNITED STATES OF AMERICA, |
| v. |
| VINCENT ARDOLINO, |
| Defendant. |

Criminal No. 22-cr-00406 (RBW)

## VINCENT ARDOLINO'S SENTENCING MEMORANDUM

Defendant Vincent Ardolino, by and through his counsel Deputy Federal Public Defender Jaya Gupta, hereby submits defendant's sentencing memorandum for the Court's consideration before the September 18, 2023, sentencing hearing. Mr. Ardolino will be sentenced following his guilty plea to one count of Parading, Demonstrating, or Picketing in a Capitol Building, in violation of 40 U.S.C. § 5104(e)(2)(G), a class B misdemeanor. Mr. Ardolino respectfully asks that this Court impose a sentence of thirty-six months of probation in consideration of his personal history—including a disadvantaged youth, his employment, and his status as a caregiver for his elderly mother and cancer-stricken stepfather.

## I.    INTRODUCTION

Vincent Ardolino's life and character extend beyond the misdemeanor offense he pled guilty to and support a sentence of probation in this case. Below the surface of Vincent's seemingly normal childhood lies a history of poverty, sexual abuse, and a chaotic home life. His childhood difficulties notwithstanding, Vincent worked hard to educate himself and contribute to society in meaningful ways including by starting and running his own business. Though he lacked any supportive father figures in his own life, he has been a doting stepfather to his

stepson, even after his marriage crumbled. And even though he endured tremendous emotional turmoil as a child—sometimes at the hands of his own parents—Vincent has been there to take care of his aging mother and aging and ailing stepfather.

Vincent recognizes that going to the Capitol on January 6, 2021, was wrong, and that his actions contributed to one of the darkest days in this Nation's history. He does not wish to make excuses for his conduct. But his nonviolent and mostly quiet behavior at the Capitol places him among the least offensive January 6th defendants, many of whom (if they have been sentenced already) have received noncustodial sentences. As detailed below, the defense respectfully requests a sentence of three years of probation, which is sufficient, but not greater than necessary to achieve the goals of sentencing in this case.

## II.     PROBATION IS REASONABLE PUNISHMENT UNDER 18 U.S.C. § 3553(a)

### A.     Mr. Ardolino's History and Characteristics Support a Noncustodial Sentence

#### 1.     Mr. Ardolino experienced significant poverty and trauma as a child

When many people think of Southern California, they think of sunshine and beaches, privilege and a carefree life. Not for Vincent Ardolino. The sunshine and beaches of Southern California only masked the poverty, trauma, and struggle that Vincent faced growing up. Though he technically had one, Vincent grew up without a father. PSR at ¶ 47.  His dad was involved in a horrific motorcycle accident that left him severely brain damaged when Vincent was not even a year old. *Id*. Following that accident, Vincent's father—who before the accident was not with his mother and who had not been present at his birth—was relocated to the East Coast so that his family could care for him. *Id*. He left behind a son, whom he had never met, who needed him.

For the next ten years of his life, Vincent was raised in a rough part of Southern California by his mother, Stacey, who struggled to provide for him as a single mother who was

not even 23 years old. PSR at ¶ 52 They lived on food stamps when, as Vincent will tell you, "they were still stamps that you took out of the jar on the kitchen counter." To make ends meet, Stacey worked around-the-clock, which meant that Vincent was a "latchkey kid"—literally wearing the key to his home around his neck every day to school because he was responsible for getting himself home and taking care of himself without any adult supervision (or guidance) after school had ended for the day. While many children would likely dream of no adult supervision, having none was not harmless for Vincent. Vincent was once present alone when his home was being burglarized. When Vincent was seven and eight years old, a much-older neighbor lured him to his home with bribes of toys and sexually assaulted him on several occasions over a two-year period. PSR at ¶ 53. The abuse only stopped when Vincent and his mother moved away. Fearing it would break her heart when she was already dealing with so much, Vincent never told his mother, and thus, endured the trauma alone and in silence for the rest of his life.

Vincent's and his mother's financial situation improved when his mother married her now-husband when Vincent was 10 or 11 years old. PSR at ¶ 52. But Vincent and his new stepfather did not see eye to eye and their personalities clashed frequently. PSR at ¶¶50-51. Vincent's stepfather was strict and overbearing, and did little more than to financially provide for and tolerate his new stepson. *See id*. He had anger issues, and had no reservations about reminding Vincent who paid the bills in an attempt to get Vincent to bend to his will. When Vincent would not, and they clashed, his stepfather would break things in the home and be verbally abusive toward Vincent. *See* PSR at ¶ 50. Needless to say, this led to a very chaotic and tension-filled home life. While Vincent's mother tried to mediate when her husband and her son would clash, she had two additional children (Vincent's stepbrother and stepsister) that she now needed to think of whenever she attempted to step in between her husband and her eldest son.

3

Unable to tolerate his stepfather any longer, at age 14, Vincent gave up and left to live with his grandparents. PSR at ¶ 51. He eventually left his grandparents' home and began living on his own at just 17 years old. *Id*. Though he had a close relationship with his mother and his stepsiblings—whom he had helped take care of when he himself was still a child—Vincent always felt an overwhelming sense of being unwanted and an outsider, even in his own family.

### 2.     Despite Dropping Out of High School, Mr. Ardolino Earned His GED, Attended Aviation School, and Started a Business

Perhaps not surprisingly given the abuse he had endured and the turbulence at home that followed, Vincent struggled in school. PSR at ¶ 68. Vincent's mother was working full-time and was otherwise preoccupied with her two youngest children and his stepfather took little interest in him, so no one was there to help Vincent with homework or provide additional support when he needed it. Notwithstanding those struggles, Vincent persevered and eventually obtained his GED from a different high school than he had originally attended. PSR at ¶ 69.  A few years after obtaining his GED, Vincent attended a local community college for a semester and, shortly after that, uprooted his entire life and everything he had known to go to Oklahoma so that he could attend Spartan School of Aeronautics to study aviation mechanics. PSR at ¶¶ 70-71. He worked various jobs, including working for approximately four years as an engineer at SECO-LARM USA Inc. PSR at ¶ 76. After he left SECO-LARM, Vincent continued his education by enrolling in a local community college to learn how to be an electrician. PSR at ¶ 72. After working for others for several years in the field, in 2016, Vincent hung his own shingle and opened his own business, Cal Coast Electric, a business he has kept afloat through many ups and downs, particularly during the COVID-19 pandemic. PSR at ¶ 74. During good times, Vincent was busy and able to employ others. During hard times, Vincent would do everything he could to

scrape by and keep his business afloat. At all times, Vincent has worked hard to earn the loyalty

of his customers, who have written on his behalf about how Vincent will go out of his way for

them—even those whose political views he does not share. *See* Ex. A. Not only does he

volunteer his services through his church (discussed below), Vincent has worked for free for

some of his customers who could not afford to pay him—knowing well what it is like to fall on

hard times. Through blood, sweat, and tears, Vincent has kept Cal Coast Electric going, and is

grateful and humbled by his many customers who have allowed him into their home.

### 3.   Despite His Own Troubled Childhood, Vincent Is a Doting Stepfather



In the early 2000s, Vincent met and fell in love with Rebecca, whom he would marry a

few years later in 2009. PSR at ¶ 55. When Vincent married Rebecca and became a stepfather to

Nathan, he strove to be a better stepfather (and father) to him than he had had. PSR at ¶¶ 55-56.

And he was. *See id*. He treated Nathan like his own son, taking him to school, helping him with

homework and school projects, going to the park to practice baseball, being a doting dad at

weekend Little League games, and helping him learn about the world by traveling, visiting

museums, and aquariums. *See id*.



Vincent even took Nathan to pan for gold to teach him about California's history and the gold

rush. When Vincent dedicated himself to his faith in earnest in 2014, he wanted the same for

Nathan, so he and Nathan got baptized at the same time. No one would have blamed Vincent if

he had simply decided to be an aloof stepfather given his own experiences, but he did not do that.

As a testament to his character, Vincent went all in on being a stepfather and cherished it. He had

finally found a family—and a sense of belonging that had eluded him for most of his life.

Sadly, however, Vincent's domestic bliss would not last as his marriage to Rebecca

crumbled following her continuing struggle with bipolar disorder and some infidelity on her part

in 2016. PSR at ¶ 55. Vincent's heart broke even further when Nathan eventually left to live with

his father in Hemet, California, approximately two hours away from where Vincent, Rebecca,

and Nathan had lived together. *See* PSR at ¶ 56. Though Vincent grieved the loss of his once

idyllic family unit, he has continued to be involved in Nathan's life as much as he can—wanting to be the father figure he never had. *See id*.

### 4. Vincent Has Been a Devoted Member of His Church and Has Been a Volunteer in Its Service

Vincent had not grown up religious—his mother had no time for that in trying to juggle raising a child by herself and working full-time. When his grandmother passed away many years later, her family was not planning on holding services for her—an unacceptable proposition for Vincent. So he took on the solemn task himself, and he could not think of a better way to honor his grandmother than to arrange for her services at the church she had attended. During her services, Vincent became inspired by the many individuals from her church who came to pay their respects. Specifically, Vincent was inspired by the sense of community they embodied. He finally felt a sense a belonging. So in 2014, Vincent was baptized (along with Nathan), and since then, he has been an active member of his grandmother's church. Not only does he attend services on Sundays, Vincent frequently volunteers on behalf of the church. In 2014—the very year that he joined—he went with his church to Colorado to assist victims of a recent flood rebuild their homes. Though he is an electrician by trade, Vincent spent that trip applying dry wall. In the years since, he has frequently volunteered to paint over graffiti, and remove trash from the Bolsa Chica Ecological Reserve, a protected wetlands reserve in Southern California, and prepare and distribute kits containing necessities like toiletries, socks, food and other essentials for the large number of individuals in Southern California experiencing homelessness.

### 5. Despite His Own Childhood, Vincent Has Also Been a Devoted Son and Stepson

Though Vincent's childhood was chaotic and traumatic—getting so bad that at age 14 he

was forced to leave home—Vincent has been there for both of his parents as an adult. In 2021, Vincent moved back to his parents' home to help care for them and the household around the time his stepfather was diagnosed with throat cancer. *See* PSR at ¶ 48. For the last few years, Vincent has been there to help care for his stepfather as he has gone through surgery and chemotherapy. Though he was the most overlooked of all of his mother's children and clashed frequently with his stepfather during his childhood, it is a testament to Vincent's selfless character that he is the one child who stayed nearby and has cared for his parents as they aged and ailed.

Notwithstanding Vincent's conduct on January 6, 2021, at heart, he is a kind man who tries to do good. His history and characteristics support a sentence of probation.

**B.     The Circumstances of The Offense Support A Noncustodial Sentence**

Vincent was not always a Donald Trump supporter. To the contrary, Vincent supported Mitt Romney and Ted Cruz in the primaries before the 2016 election, and actually was against electing Mr. Trump to the presidency. To use Vincent's and Mr. Trump's own words, Vincent was a "NeverTrumper."



But when Mr. Trump became the Republican nominee, and eventually the president, Vincent began to reconsider his opinion. Afterall, he had watched Mr. Trump on "The

Apprentice." As a business owner himself struggling to get Cal Coast Electric off the ground,

Vincent admired Mr. Trump's purported business acumen resulting in a vast business empire.

Whereas Vincent had always had a somewhat timid personality, he admired Mr. Trump's

brashness. Though Vincent did not agree with many things that Mr. Trump said or did, he still

admired Mr. Trump's willingness say exactly what he thought, no matter the consequences. To

Vincent, Mr. Trump's boldness and unabashed readiness to say what was on his mind equated in

Vincent's mind to being a truthteller because he believed Mr. Trump did not take time to

deliberate a more deceptive response. In short, he came to admire Mr. Trump and believed Mr.

Trump was telling him the truth.

Fast forward a few years to 2020, like many, Vincent was forced to shelter in place

during the COVID-19 pandemic. COVID and COVID restrictions took a toll on his business as

business disappeared. Those same restrictions meant Vincent could not attend church or see

much of his community. His admiration for Mr. Trump only grew as then-President Trump

called for the country to be reopened.

Like many other individuals who were participants on January 6, 2021, in the lead up to

that day, Vincent believed then-President Trump and his surrogates when they claimed that there

was election fraud, and that the election had been stolen. Vincent did not and could not believe

that the then-President and his surrogates—a number of whom were former law enforcement,

sitting senators (including Ted Cruz and Lindsey Graham), and former federal prosecutors

(Rudolph Giuliani, Sidney Powell, and Joseph diGenova), all individuals charged with faithfully

enforcing the laws—would make up such a claim from whole cloth. Vincent's text messages,

referenced in the plea agreement and his PSR, reflect that he planned to travel to Washington,

D.C. to heed then-President Trump's call. As he explained to a friend, "I've never been to DC

before but when President Trump said to be in DC on the 6th, I couldn't stand by and not answer the call. That is a key date pivotal to America's future and DC will be the epicenter." PSR at ¶ 19(c). And so, Vincent answered Mr. Trump's call, traveling to Washington D.C. on January 4, 2021. PSR at ¶ 22.

  As it turns out, Vincent and the rest of the public were told an inflammatory lie by a sitting President and surrogates that the election had been stolen, and democracy was being threatened by an opposing political party. Vincent had heard the words for himself as he had attended then-President Trump's speech on January 6, 2021, when he continued to rile up the crowd by repeating that he had actually won the presidential election. Describing the circumstances as "the most brazen and outrageous election theft," "a pure theft in American history," and that "[t]here's never been anything like this," the then-President urged Vincent and his supporters to march to the nearby Capitol building. *Read: Former President Donald Trump's January 6 Speech*, avail at https://www.cnn.com/2021/02/08/politics/trump-january-6-speech-transcript/index.html. Although the then-President claimed that "everyone here will soon be marching over to the Capitol building to peacefully and patriotically make your voices heard," he also challenged them to action by stating that "you'll never take back our country with weakness," and that "we will see whether Republicans stand strong for integrity of our elections, but whether or not they stand strong for our country." Although the then-President often used "we"—suggesting that he, too, would next walk with Vincent and his supporters to the Capitol— he did not.

  Vincent did not premeditate his presence at the Capitol building that day. He was not planning on going to the Capitol, and instead followed the crowd after then-President Trump's speech. This is confirmed by the fact that Vincent did not bring any weapons or anything to

disable or disarm the police. He was not dressed in tactical gear. He did not disguise himself to prevent anyone from being able to identify him. All of this is because he was not planning on becoming involved in any riot. He was not and is not a militia member, a member of any extremist group, or habitual disruptor. To the contrary, Vincent was an unsophisticated political participant, who—never having attended a protest ever before in his life—found himself, and admittedly allowed himself, to follow the crowd to the Capitol following Mr. Trump's speech.

When Vincent walked into the Capitol building through the Senate Wing Door, it was well after that door had already been breached by other rioters an hour or so earlier.  *See* PSR at ¶¶ 15, 23. By the time he approached the door, the crowd was already streaming in and the path in was unobstructed. Vincent entered and walked around with his phone. He entered the Senate Spouses' Lobby and the Crypt and walked back out the same door through which he had entered. PSR at ¶ 23. Having never been to the Capitol (or even Washington, D.C.) before, Vincent did not know where he was going and did not intend to enter a sensitive area. In total, Vincent spent *ten minutes* in the Capitol building. PSR at ¶ 23. He did not shout, break anything, take any property, incite others, "livestream" his conduct, or engage in any violence in the building. He did not even speak to anyone in the building. His conduct in the Capitol itself was amongst the least offensive of all January 6th defendants.

Similarly, during his time on Capitol grounds, Vincent was nonviolent. He never broke anything. He never said anything or yelled at police officers until the very end of his time on the grounds, when Vincent briefly yelled at police officers who were arriving to protect the Capitol. In sobering hindsight and given his longstanding respect for law enforcement, Vincent deeply regrets and is deeply embarrassed that he yelled at officers who he recognizes were just doing their sworn duty in protecting the Capitol and its lawful occupants. Vincent, however, did not try

11

to obstruct their path or stop them from going where they needed to go. He briefly yelled and then exited the grounds.

In all, Vincent mostly just walked around and took some photos and videos. He was never violent, never destroyed property, never stole property, never egged on others, and never "live-streamed" his conduct. Consistent with his generally shy demeanor, Vincent stuck to himself and did not engage with the crowd. He certainly did not try to incite anyone else.

Vincent, nonetheless, takes responsibility for what he did, which he acknowledges contributed to one of the darkest days in our Nation's history. While the government points Vincent's social media posts and claims Vincent has never expressed remorse and instead has "doubled-down" those posts are *dated* (January 8, 2021, January 9, 2021, June 30, 2021, and July 14, 2021) and significantly predate this case. Same with his statements to the FBI, occurring in February of 2022.

Once charged, Vincent has shown genuine remorse for his actions throughout these proceedings—notwithstanding the government's claims to the contrary—by waiving preliminary hearing, not filing any motions even though Vincent was initially identified as being at the Capitol using a legally dubious "geofence" warrant, promptly accepting the government's plea offer without dragging the proceedings out or forcing a trial. He has not sought to return to Washington D.C. and has readily agreed to all proceedings—including after expiration of the C.A.R.E.S. Act—being held remotely. In addition to pleading guilty in May of 2023, less than six months after being arrested on the instant charge in December 2022, Vincent voluntarily spoke with FBI agents on February 10, 2022, including eventually admitting his participation in the events of January 6th though he initially denied that he was there. He has not sought to have the government, or the federal judiciary incur any further expense at his account, and instead has

12

sought to promptly resolve his case.

      If that were not evidence enough, those individuals who see Vincent frequently and who are perhaps in the best position to tell this Court as to whether he has shown genuine remorse see it in his day-to-day demeanor. *See* Ex. A. Whereas before Vincent engaged in "spirited debates" about the state of our Union with his customers, he no longer does so. Because he feels shame for being duped. Rhetoric is powerful, and all the more so when it is wielded by powerful people "in the know." Just as this Court has recognized that inciting others such as through live-streaming one's conduct on a social media platform, is aggravating, *see* Reporter's Transcript at 42-43, *United States v. Castro*, D.D.C. No. 21-cr-00299-RBW, ECF No. 55 (Apr. 6, 2022), being incited, and frankly, duped—particularly by the powerful, those charged with the solemn duty of faithfully executing our laws, and those with the greatest access to information—is mitigating.

      Considering the spectrum of conduct of January 6th participants, Vincent's conduct that day was close to the least offensive end of the spectrum, which he respectfully submits warrants a sentence of probation.

**C.    A Noncustodial Sentence Provides Just Punishment, Need for Deterrence and Protection of the Public, and the Need to Avoid Unwarranted Sentencing Disparities**

      Vincent's life leading up to the offense conduct, and his conduct since the offense, demonstrate that a sentence of probation will suffice to protect the public as there is not a likelihood of recidivism. He has been on released on conditions since his arrest, with no violations. PSR at ¶¶9-10. His conduct since his arrest in obeying all bond conditions and promptly taking responsibility to resolve his case demonstrate his deterrence from future criminal conduct and respect for the law. *See id.*

Regarding the need to avoid unwarranted sentencing disparities, many misdemeanants convicted of violating 40 U.S.C. § 5104(e)(2)(G) received sentences that did not include custody. In *United States v. Ziab*, the government also requested 45 days incarceration. *See* Gov's Sent's Position at 1, *United States v. Ziab*, D.D.C. No. 21-cr-389-RBW, ECF No. 43 (Mar. 28, 2022). There, Mr. Ziab was told by law enforcement officers to leave, but he continued to wander through the Capitol building, even when it appeared to be filled with teargas. *Id.* at 2, 8, 11. He remained in the Capitol building for approximately thirteen minutes, and only left the building because of law enforcement's efforts to push rioters out. *Id*. During his time in the building, he carried a bright yellow, "Don't Tread on Me" flag. *Id*. at 5. He entered sensitive areas including the House Appropriations Room. *Id*. at 2. Notably, Mr. Ziab also had significant criminal history including being previously convicted for domestic violence. *Id*. When the FBI attempted to interview him and asked if he had entered the Capitol building, he requested an attorney because he did not want to incriminate himself. *Id*. at 3. He also made comments minimizing what had occurred that day. *Id*. Mr. Ziab's conduct was similar to if not worse than Vincent's. In spite of this, and notwithstanding the government's request for 45 days incarceration, this Court sentenced Mr. Ziab to thirty-six months of probation. *See* Judgment at 2, *id.*, ECF No. 56 (Apr. 5, 2022).

In *United States v. Mariotto*, the defendant entered the Capitol building approximately five minutes after the Senate Wing Door was breached and raised his fist. *See* Gov's Sent's Position at 2, 5, *United States v. Mariotto*, D.D.C. No. 21-cr-00094-RBW, ECF No. 35 (Dec. 10, 2022). He also entered and remained in a sensitive part of the Capitol—the Senate Gallery—

where he took a selfie, which he posted to Facebook.[1] *Id*. at 2, 10. He was present for and recorded assaults on police officers while in the Capitol building and while walking through several hallways, he yelled "Where are the traitors?" and "USA" while attempting to open multiple closed doors. *Id*. at 2, 6. He appeared to taunt Capitol Police who had arrived to block the rioters from going further, saying "yeah, like they're going to stop us." *Id*. at 6. In total he spent approximately twenty minutes in the Capitol building. *Id*. at 10. Afterwards, Mr. Mariotto gave an interview to the press, the day after he was arrested, minimizing his conduct. *Id*. at 11. His conduct was far more egregious than Vincent's, which is likely why the government asked for a split sentence of four months incarceration and three years of probation. *Id*. at 1. This Court eventually sentenced Mr. Mariotto to three years of probation only. *See* Judgment at 2, *id.*, ECF No. 39 (Dec. 28, 2021).

In these cases, which involved similar if not worse conduct than Vincent's, this Court found it reasonable to impose a sentence of probation. As such, Vincent respectfully submits that a sentence of three years' probation would be reasonable here, and not result in a sentencing disparity. A probationary sentence, while more lenient than custodial time, is still a significant punishment, especially for someone like Vincent who has relatively minor criminal history. It would allow him to continue to help care for his aging parents and continue running his business, which has only one other employee. PSR at ¶ 74. To the extent the Court finds additional punishment warranted, Vincent respectfully asks the Court to consider home detention which would allow him to continue operating his business and to continue to assist his aging parents.

---

[1] Mr. Mariotto appears to have also obstructed justice by deleting his Facebook account prior to law enforcement identifying him as a participant. *See id*. at 10.

## III.    CONCLUSION

For the foregoing reasons, Vincent Ardolino respectfully asks this Court to sentence him to thirty-six months of probation. He agrees to the restitution amount proposed by both Probation and the government.

Respectfully submitted,

DATED:  September 13, 2023           */s/  Jaya Gupta*

JAYA GUPTA
Deputy Federal Public Defender
(Cal. Bar No. 312138)
(E-Mail:  Jaya_Gupta@fd.org)
Office of the Federal Public Defender, C.D. Cal
411 W. Fourth Street, Suite 7110
Santa Ana, CA 92701
Telephone: 714-338-4500

## PROOF OF SERVICE

I declare that I am a resident or employed in Orange County, California; that my business address is the Office of the Federal Public Defender, 411 West Fourth Street, Suite 7110, Santa Ana, California 92701-4598, Telephone No. (714) 338-4500; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached **VINCENT ARDOLINO'S SENTENCING MEMORANDUM** on the following individual(s) by:

| [ ] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [X] Via email addressed as follows: |
|---|---|---|---|

**Mairi Cervantes**

**United States Probation Officer**

**Mairi_Cervantes@cacp.uscourts.gov**


This proof of service is executed at Santa Ana, California, on September 13, 2023.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*/s/Annie Darbinian.*
**Annie Darbinian**

17