```
 1                 UNITED STATES DISTRICT COURT
                 FOR THE DISTRICT OF COLUMBIA
 2
     * * * * * * * * * * * * * * *   )
 3   UNITED STATES OF AMERICA,       )      Criminal Action
                                     )       No. 22-00406
 4              Plaintiff,           )
                                     )
 5      vs.                          )
                                     )
 6   VINCENT ARDOLINO,               )      Washington, D.C.
                                     )      September 18, 2023
 7              Defendant.           )      12:01 p.m.
                                     )
 8   * * * * * * * * * * * * * * *   )

 9

10             TRANSCRIPT OF SENTENCING HEARING
                    CONDUCTED VIA ZOOM
11          BEFORE THE HONORABLE REGGIE B. WALTON
                 UNITED STATES DISTRICT JUDGE

12

13

     APPEARANCES:
14

     FOR THE GOVERNMENT:     ANDREW HAAG, ESQ.
15                           UNITED STATES ATTORNEY'S OFFICE
                               FOR THE DISTRICT OF COLUMBIA
16                           601 D Street, Northwest
                             Washington, D.C. 20530
17
     FOR THE DEFENDANT:      JAYA C. GUPTA, ESQ.
18                           OFFICE OF THE FEDERAL DEFENDER
                             411 West Fourth Street
19                           Suite 7100
                             Santa Ana, California 92701
20
     FOR U.S. PROBATION:     CRYSTAL LUSTIG
21
     REPORTED BY:            LISA EDWARDS, RDR, CRR
22                           Official Court Reporter
                             United States District Court for the
23                             District of Columbia
                             333 Constitution Avenue, Northwest
24                           Room 6706
                             Washington, D.C. 20001
25                           (202) 354-3269
```

1              THE COURTROOM DEPUTY:  Good morning, your Honor.

2     This is Criminal Matter 22-406, the United States of America

3     versus Vincent Ardolino.

4              May I have counsel and Probation state your

5     appearance for the record, beginning with the Government.

6              MR. HAAG:  Good afternoon, your Honor.  Andrew

7     Haag for the United States.

8              THE COURT:  Good afternoon.

9              MS. GUPTA:  Good afternoon, your Honor.  Jaya

10    Gupta for Vincent Ardolino, who is present and out of

11    custody.

12             THE COURT:  Mr. Ardolino, would you identify

13    yourself?

14             THE DEFENDANT:  Yes, sir.  Vincent Ardolino.

15             THE COURT:  And we have somebody from Probation?

16             THE PROBATION OFFICER:  Yes.  Good afternoon, your

17    Honor.  Crystal Lustig from the probation office.

18             THE COURT:  Good afternoon to everybody.

19             In preparation for this sentencing, I did review

20    the information again; also, the plea agreement, the

21    presentence investigation report, the probation officer's

22    sentencing recommendation and also the Government and the

23    Defendant's sentencing memoranda.

24             Is there anything else I should have reviewed in

25    preparation for this sentencing?  Government counsel?

1          MR. HAAG:  Nothing further, your Honor.

2          THE COURT:  Defense counsel?

3          MS. GUPTA:  No, your Honor.

4          THE COURT:  Very well.

5          Government counsel, you may proceed with

6    allocution.

7          MR. HAAG:  Thank you, your Honor.

8          In this case, the Defendant pleaded guilty to one

9    count of 5104(e)(2)(G) of Title 40.  The Government's

10   request here is the Court sentence the Defendant to 45 days'

11   incarceration as well as impose the agreed-upon $500

12   restitution.

13         The reason for that recommendation, walking

14   through the 3553 factors, is first the nature of the offense

15   and the defense characteristics.

16         The offense, as the Court is well aware, was

17   participation in one of the most series events in American

18   history, participating in a riot that impacted the peaceful

19   transfer of power following the 2020 presidential election.

20         The Defendant does not have a clean criminal

21   history.  He has prior offenses.  There are some older ones

22   from the early 2000s, but I think the most relevant one for

23   the proceedings today is the Defendant's DUI conviction for

24   which he was on probation for -- at the time of the offense.

25   That alone, I think, indicates that the Defendant's request

1    for straight probation is not appropriate in this case.

2          Probation should be some type of deterrent from

3    committing another criminal offense, and that's not what

4    happened here.

5          So the Government believes that incarceration is

6    the appropriate penalty in this case.

7          And then in terms of -- reflecting the seriousness

8    of the event and the offense itself, it is correct that the

9    Defendant walked in through the Senate wing door and was

10   taking photos and walked out.  He was not one of the violent

11   participants.  But that does not take away from the

12   Defendant's own impact on January 6th.  Specifically, as has

13   been heard many times in these cases, the simple presence of

14   someone being in the Capitol along with all of the other

15   rioters was a significant impact on law enforcement's

16   ability to control the riot.

17         So the idea that he was just a nonviolent

18   individual doesn't fully take away from what the Defendant

19   did that day.  Additionally, there is a need to promote the

20   respect for the rule of law.

21         I'm going to pull up now Government's Exhibit 3,

22   which was cited in the memorandum.  For reference, this is a

23   video that the Defendant took on January 6th that was

24   recovered from his phone.

25         (Whereupon, Government's Exhibit No. 3 was

1    published via Zoom.)

2            MR. HAAG:  Your Honor, that there was taken just

3    outside of the Capitol Building in the midst of the riot.

4    Several law enforcement officers were responding to the

5    scene to help control the riot; and in response, the

6    Defendant decided to take a video of them and curse them,

7    accost them, call them traitors for just doing their jobs.

8            Those were individuals who were walking into a

9    very serious riot.  Many officers were injured.  And in the

10   Defendant's view, they needed to be accosted.

11           This is in track with the Defendant's view of

12   January 6th as a whole.  He thought it was a staged event,

13   that it was -- essentially, there was a conspiracy theory

14   behind January 6th.  So rather than grappling with his own

15   crimes and his own impacts on January 6th and his own

16   participation, he instead decides to accost police officers

17   and promote conspiracy theories.

18           Relatedly, the Defendant shows no remorse for his

19   actions.  The Defendant does say in his sentencing

20   memorandum that he does show remorse.  But he only showed

21   that remorse after he was charged.  He says specifically

22   since or once charged he has shown remorse.  That's not

23   remorse, your Honor.  That is not apologizing for his

24   actions.  That's just being sorry that he was charged.

25           And his comments that he put on social media, both

1    before and after January 6th, show that he has no remorse

2    for his actions.

3          Turning next to the need for detention -- I

4    mentioned this a moment ago -- the Defendant was on

5    probation.  He was not deterred from committing a new

6    offense while he was on probation.  So there needs to be a

7    heightened punishment for the Defendant in order to properly

8    deter him.  Specifically, also, his comments about

9    January 6th indicate that potentially he could reoffend in

10   the future in a similar manner.

11         Lastly, your Honor, the need to avoid unwarranted

12   sentencing disparities:  I'd note that the Defendant cites

13   in his brief *Zlab*, which was a case that your Honor handled

14   and that the Defendant there also had a criminal record, but

15   I do not believe the Defendant was on probation at the time

16   of the offense in question.  So I don't believe that's a

17   proper comparison case.

18         I believe the better comparison case is *Galloway*.

19   There, the Defendant had no criminal record, but promoted

20   similar conspiracy theories, lied to the FBI and received an

21   incarceration sentence there.

22         So based on the Defendant's record as well as his

23   interview to the FBI -- and I did forget to mention that

24   during his interview to the FBI, the Defendant essentially

25   lied about his actions on January 6th.  First, he said that

1  he went to the rally on the Ellipse and then went back to

2  his hotel.  When asked if he did anything else, he said he

3  went outside to get some food.  And then when confronted

4  with a photo of him standing outside the Capitol, he said:

5  Okay.  Yes.  I went to the Capitol.

6          And then the agents brought up the geo evidence

7  that indicated the Defendant's phone was inside the Capitol.

8  He still at that point didn't admit to going inside the

9  building, despite his own text message that he had sent to a

10 friend shortly after the riot that he had gone inside the

11 Capitol specifically.

12         But when the officers -- the agents showed him the

13 video of him going inside the Senate wing door, he finally

14 said, Oh, I was just following the crowd.  I don't know if

15 it was the Capitol.  I went into some building.  I followed

16 the crowd.  But he knew it was the Capitol because he told a

17 friend that he went into the Capitol.

18         So for all of these reasons, the Defendant's

19 criminal record, his participation in the riot, his conduct

20 with the FBI, the Government does believe that a 45-day

21 sentence of incarceration as well as $500 in restitution is

22 appropriate.

23         THE COURT:  I neglected to ask, but I did review

24 the report prepared by Probation; and what I saw was there

25 are no objections either by the Government or the defense to

1    the accuracy of the information in the report.  Is that

2    right?

3              MR. HAAG:  That's correct, your Honor, from the

4    Government.

5              MS. GUPTA:  Your Honor, I did notice one typo that

6    I did not make an objection to.  It's in Paragraph 46.  It's

7    just the year of his birth.  In Paragraph 46, it says that

8    he was born in 1974.  He was actually born in 1977.  And so

9    that's the only correction that I had.  And I did not make

10    an objection otherwise.

11             THE COURT:  Very well.  Then I'll order that that

12    change be made.

13             MS. GUPTA:  Thank you, your Honor.

14             THE COURT:  Very well.  Defense may proceed with

15    allocution.

16             MS. GUPTA:  Thank you, your Honor.

17             Your Honor, I'm not going to reiterate the

18    argument that I made in my sentencing memo.  But I did want

19    to touch on a few brief points and then also respond to some

20    of the comments that the Government made.

21             As to the nature and circumstances of the offense,

22    your Honor, I think we can agree that Vincent was briefly in

23    the Capitol Building.  He walked in.  He observed what was

24    going on.  He took photos.  He did go into the Crypt and the

25    Senate spouses' lounge and then he exited the same door that

1    he had walked in through.

2              In total, he was there for approximately ten

3    minutes.  And in that time, he did not commit any property

4    damage; he didn't steal any property; he didn't commit any

5    violence; he didn't incite others; he didn't talk to a

6    single other person when he was in the Capitol Building.

7    And he didn't livestream his conduct and he certainly didn't

8    celebrate getting into the Capitol Building.  He went in; he

9    walked around quietly; then he walked out.

10              And the Government did play the video of

11   Mr. Ardolino yelling at the police officers.  And, your

12   Honor, I'm not going to attempt to justify that.  I would

13   just say that he is deeply embarrassed that he behaved in

14   such a way.  It is inconsistent with his longtime support of

15   law enforcement.

16              One thing I would note is in his FBI interview

17   there was a task force officer from the local police

18   department also present.  One thing that they discussed was

19   how Mr. Ardolino had a Huntington Beach Police Department

20   sticker on his car.  He didn't know that police were coming

21   that day.  He didn't know that he would be interviewed.

22   It's a small gesture, but it demonstrates his support for

23   law enforcement.

24              And so he's not proud of his behavior.  And I

25   would submit that it's inconsistent with his character.

1      Your Honor, nonetheless, Mr. Ardolino, he has

2  accepted responsibility for what he did.  He's not making

3  excuses for what he did.  He's not trying to justify his

4  conduct.  He recognizes that he broke the law and has tried

5  to resolve his case without making the Government or the

6  judiciary incur any further expense on his account.

7      As far as his history and characteristics, I went

8  into that in detail in my memo.  He is a person that has

9  suffered tremendous adversity in his life.  He had a very

10  disadvantaged youth.  He didn't have a whole lot of parental

11  guidance or supervision growing up.  He's worked hard to

12  overcome that adversity and, frankly, to do better by his

13  loved ones than his loved ones had done by him.

14      And so notwithstanding his actions on January 6th,

15  I would submit to your Honor that he is fundamentally a

16  decent man, which is something one of his customers wrote

17  about.  That's demonstrated by the type of stepfather he is,

18  the type of son that he is, the type of citizen and business

19  owner that he is.

20      Your Honor, as far as just punishment and

21  deterrence, I would note that we're almost three years after

22  what happened on January 6th.  And there is no evidence that

23  Vincent has ever sought to engage in any similar conduct

24  since then.

25      One thing I would specifically point out is,

1    following Mr. Trump's numerous indictments, he has called on

2    who remained of his supporters to engage in disruptive acts

3    as retaliation.  And Mr. Ardolino has not engaged in any

4    such behavior.

5         I would submit that this is evidence that he has

6    been deterred; and frankly, he's learned his lesson that

7    engaging in disruption is not the appropriate way to express

8    disagreement.

9         I would also submit that probation better serves

10   the goals of deterrence here than does a sentence of

11   imprisonment.  By the looks of it, Mr. Trump will be the

12   2024 Republican nominee.  And if this Court imposes a

13   sentence of probation, the Court will have supervision over

14   Mr. Ardolino to ensure that he doesn't engage in any further

15   disruptive behavior.

16        And Mr. Ardolino is aware that if he does, that

17   he's facing a very harsh penalty and that this Court will

18   show him no leniency whatsoever.

19        So I would submit looking over your shoulder for

20   the next three years is more deterring than, you know, a

21   one-and-done sentence of imprisonment.

22        As far as the examples and sentencing disparities,

23   the examples that we pointed out in our brief I would submit

24   are more similar to Mr. Ardolino's conduct than are the

25   examples pointed out by the Government.  In *Galloway*, which

1    the Government pointed to today, Mr. Galloway entered the

2    Capitol approximately 11 minutes after the initial breach;

3    and he entered by climbing through a broken window.  Before

4    he had entered, he had saw police pepper spraying

5    individuals and he saw blood on -- he saw droplets of blood.

6        And after getting into the Capitol, he celebrated

7    by pumping his fists in the air and shouting.  He then was

8    present in the Capitol for approximately ten minutes before

9    exiting and again shouting, "That was us.  These are our

10   streets.  This is our country."  So he was clearly very

11   proud of being there and overcoming law enforcement.  I

12   would also note that he was a serviceman in the Navy for

13   approximately four years prior to January 6th and he

14   followed members of the Proud Boys.  And so that -- I would

15   submit that distinguishes his case from Mr. Ardolino's.

16       The other example is *United States v. Pham*.

17   Mr. Pham was also a senior police officer within the Houston

18   Police Department at the time of the January 6th offense.

19   He was in the Capitol for almost twice as long,

20   approximately 20 minutes.  He entered again closer to the

21   time of the initial breach.  And it sounds like he climbed

22   up the walls because he entered near the upper terrace door.

23       He walked into the Capitol with the Trump flag

24   draped across his back.  He celebrated by getting into the

25   Capitol saying, "We're taking our House back."  He also

1    entered the Rotunda, which is not somewhere where

2    Mr. Ardolino went.  And he stayed there for approximately

3    seven minutes before eventually entering House

4    Representative Kevin McCarthy's office space.  So he got

5    closer to the occupants of the Capitol Building than

6    Mr. Ardolino did.

7            Both of those examples, your Honor, I would submit

8    are more egregious in nature and likely warranted the

9    sentences received in those cases.

10           The cases -- the sentences this Court has handed

11   down are more in line with what Mr. Ardolino did.  And those

12   are referenced in my memorandum.

13           As far as his criminal history, your Honor, I

14   acknowledge that Mr. Ardolino does have some criminal

15   history.  But they are mostly for traffic offenses.  A lot

16   of them are outdated.  He was on probation for a 2019

17   conviction for conduct that had happened in 2016.

18           Again, Vincent didn't go to the Capitol intending

19   to break the law.  He was at Mr. Trump's rally and then

20   followed the crowd to the Capitol.  He was on probation at

21   that time, but he didn't necessarily show a disrespect for

22   the law.  He entered the Capitol.  It was an unthinking

23   error on his part as opposed to blatant disregard.

24           So I don't -- I would respectfully disagree that

25   simply being on probation while he engaged in the underlying

1    acts warrants a sentence of incarceration here.

2          Your Honor, I would just conclude that

3    Mr. Ardolino is sorry for what he's done.  He hasn't engaged

4    in any further such conduct.  It's very unlikely that his

5    behavior will be repeated again.  Even his customers see a

6    change in his demeanor, his day-to-day demeanor.  A sentence

7    of probation is appropriate here.  It deters him.  It also

8    is reasonable because it allows him to continue to run his

9    business and help care for his parents.  And so I would

10   respectfully ask this Court to consider a sentence of

11   probation.

12         THE COURT:  I guess the only concern I have about

13   probation is he's been given probation five times in the

14   past and it doesn't seem to send a message to him that he

15   needs to clean up his act and not engage in further criminal

16   behavior because, despite having received those breaks in

17   the past, he still did what he did in this case.

18         So it doesn't seem to send a message to him that

19   illegal behavior is not acceptable.

20         MS. GUPTA:  Your Honor, again, I would just note

21   that those offenses, they're not the run-of-the-mill

22   criminal offenses.  They're -- most of them are traffic

23   violations.

24         It's not an excuse.  I hear what the Court is

25   saying.  But this is a -- a federal case is significantly

1    different, materially different, than what he has

2    experienced before.  And so I would argue that probation

3    would send a message, because he knows that violating the

4    terms of his probation almost guarantee him a sentence of

5    imprisonment if he does violate.  And I think that that

6    penalty is not as clear when you're on probation for a

7    traffic offense.

8              THE COURT:  Anything your client would like to

9    say?

10             MS. GUPTA:  Yes, your Honor.

11             THE DEFENDANT:  Yes, sir.

12             Your Honor, I'd just like to apologies for being

13   here and taking up the Court's time.  I realize that I

14   shouldn't have gone in the building.  I recognize that was a

15   mistake.  It was not my intent to be any -- disrupt or cause

16   any disruption.  But I understand that -- how that's what

17   happened.

18             It's a complete -- you know, it's not in my normal

19   character.  I was police explorer around, you know, 14, 15

20   years old.  I respect law enforcement.  I have a sticker on

21   the back of my vehicle supporting law enforcement.  I've

22   always had that strong support of law enforcement.  It's

23   just very inconsistent with my beliefs.

24             It's -- it was just, you know, never intended on

25   committing a crime or causing disruption.  We were just

1    there to, you know, make our voices heard.  But, you know,

2    the events around that day were just, you know, a very

3    embarrassing situation.  Yelling at the cops, you know, I

4    understand those officers were just there doing their job,

5    and I truly am embarrassed about that.  That was out of

6    line.  I mean, none of that was acceptable by me, but the

7    things I did say were completely out of line.  That was the

8    only thing that really, you know -- very embarrassing, that

9    whole situation there.

10            But again, I just wanted to apologize for taking

11    up the Court's time.  And I think that's about it.

12            THE COURT:  It's kind of difficult for me to

13    reconcile your statement that you have respect for the

14    police considering what you did and said to them on that

15    day.  I mean, these are people who don't get paid a whole

16    lot of money.  They put their lives on the line; and all too

17    often, you know, they get killed.  An officer out there in

18    California was assassinated.  And they had to endure

19    vulgarity and ignorance and the assault on them and calling

20    them traitors when they were just doing their job.

21            You were the traitor to the American way of life

22    in that you were not prepared to accept the electoral

23    decision made by the American public.  But yet you verbally

24    assaulted them and condemned them for doing what they did.

25    And you're responsible.

1          I don't know if you really care.  You say you do.

2     But there were numbers -- I don't know how many; four, I

3     think -- police officers who committed suicide as a result

4     of what happened that day.  Over 400, I understand, Capitol

5     Police officers have resigned.  The police department here

6     is having a hard time recruiting people.  We have about 600

7     officers short of what we need.

8          So a lot of people won't go into the police field

9     because of the type of things they have to endure, including

10    what you did to them that day.  But yet you say you respect

11    the police.

12         I can't imagine that somebody who respects a

13    particular occupation would say and do the things that you

14    did.  And then I guess that since you contribute a couple

15    hundred dollars a month to the church, you'd suggest you're

16    a Christian.  I grew up in the church, too.  I don't know

17    real Christians who act the way you acted and say the things

18    you did, use the vulgar language that you did and assault

19    police officers in the way that you did.  That's not, in my

20    view, Christian behavior.

21              THE DEFENDANT:  It is very inconsistent with my

22    character.  I understand that, sir.  I have no justification

23    for it.  I just -- it was just in the moment, the heat of

24    the moment.  And like I said, I apologize for that.  It's

25    completely inconsistent with my character.

```
 1              THE COURT:  I've had a number of these cases, and
 2      I've tried to understand how someone could develop the
 3      mentality to do what you did that day just because somebody
 4      who you don't know said that they didn't win the election.
 5      Just because they said that, you come all the way here from
 6      California and act like a darned fool.  I don't understand
 7      the mentality of somebody who does that, especially in a
 8      country like America and all that America is supposed to be.
 9              I do a lot of foreign teaching.  I was over in
10      Africa recently.  People over there don't understand.  They
11      had this high respect for America.  They saw what took place
12      on that day and they say:  That's not the America I thought
13      existed.  It's embarrassing.  I wasn't involved in this
14      craziness that took place that day, but it's embarrassing
15      for me as an American to go to other countries and have
16      people say to me:  What is America really about, considering
17      what happened that day?
18              THE DEFENDANT:  Well, respectfully, I mean, I just
19      apologize.  I have no explanation for what happened that
20      day.  It was a terrible day that hopefully will never be
21      repeated again.
22              THE COURT:  I mean, my Court of Appeals has put a
23      limit on what I can do.  There was a strong opposition to
24      the majority position taken that I either have to give a
25      prison sentence and that's it or probation.
```

1          And that puts me in a quandary because, under the

2     circumstances, especially considering what you said to those

3     officers and the way that you said it and the language that

4     you used, that if I had the option of giving you time in

5     jail and also some time on probation, that's what I would

6     do, because I think your conduct justifies you having your

7     freedom taken away from you for a period of time.

8          But the reality is that I can't do that and also

9     have some control over your conduct considering the fact

10    that we have another presidential election coming up and I

11    don't know if what you say is true or not.  A lot of people

12    open their mouths and words come out, but they don't really

13    mean it.

14         And we've seen that happen in these cases where

15    people come before the judge; they talk about how remorseful

16    they are.  And as soon as they get a lenient sentence, they

17    leave the courthouse and they say what they have to say.

18    One person -- I think it was last week after the judge gave

19    a fairly light sentence -- it wasn't a light sentence, but

20    it was a sentence -- turned around and said, "Trump won,"

21    even though he had previously made statements contrary to

22    that.

23         So I don't know if you mean what you're saying or

24    not.  You may just be trying to run a game on me and saying

25    what you say to try and help you from not having to serve

1    some time.

2         But like I say, it puts me in a quandary, because

3    I do want people to who were involved in this to understand,

4    because I don't know what the electoral result will be.  I

5    kind of know what will be said if a certain person loses;

6    and that's going to be the same thing that was said before,

7    even though last time it was, I think, 7 million people more

8    in America voted for Mr. Biden than Mr. Trump, but

9    nonetheless Mr. Trump said he won.  And I assume he's going

10   to do the same thing next time if he's the nominee with the

11   Republican party and Republicans lose again.

12        And that concerns me, that we're going to have

13   people like you who acted out the way you did because you

14   followed him down this rabbit hole, and I assume you're

15   going to do the same thing next time.  I don't know.  I hope

16   that's not the case, but I assume there will be others, if

17   not you.

18        So with the quandary that I have, in light of --

19   despite my feeling that people who were involved that day

20   need to have their freedom taken away and punished because I

21   want to have you appreciate that you can do it again if you

22   want to and you're going to go to jail, I'm not going to

23   impose a prison sentence at this time.

24        So I will impose a period of 36 months in prison

25   [sic].  There does have to be punishment.  And the

1  punishment is going to be you've got to pay the restitution

2  and $500 that was agreed upon, even though the restitution

3  amount was several million dollars.  And I'll require that

4  you pay at least a minimum of $14 per month over the period

5  that you're on supervision for 36 months so that you can pay

6  the amount of money that you owe.

7        The punishment is that I'm going to require that

8  you pay $100 per month as a fine for a total of $3,600 as a

9  fine.

10       I'm also going to require that you perform 400

11  hours of community service and that you'll do some free work

12  for some agency that provides services to people in our

13  country; and you have to do at least four hours per week in

14  order to satisfy that requirement.

15       The law does also require that you pay $10 to the

16  Court as a special assessment, and I'll require that that be

17  paid if it hasn't been paid already within 30 days from

18  today's date.

19       If you don't comply with any of these conditions

20  that I impose regarding your financial obligations, I will

21  revoke your probation and you will be sentenced to a period

22  of incarceration.

23       As conditions of your supervision, I will require

24  that you not be rearrested for any reason whatsoever,

25  whether that be federal, state or local crimes, based upon

1    probable cause.

2              I'll also require that you not use any type of

3    illegal drugs and that you be tested periodically by

4    Probation to see if there is any illegal drug usage and that

5    you not possess any type of illegal drugs.

6              I also will require that until you pay your

7    financial obligations to the Court, which you can pay in a

8    lump sum if you're able to do so, but until your financial

9    obligations are satisfied, that you provide financial

10   disclosure information to the probation department upon

11   their request indicating what your financial situation is.

12             Also, I will restrict you from creating any new

13   financial obligations while you are under the obligations

14   that you have to the Court as far as your financial

15   penalties are concerned, that you not create any new

16   financial obligations without the probation department's

17   consent.

18             I also will prohibit you from possessing any type

19   of firearm, considering the nature of what you were involved

20   in here.  Although this did not involve a firearm,

21   considering the nature of the conduct you engaged in, I will

22   prohibit you from having any firearms while you're on

23   supervision.

24             Also, your restitution will be paid to the

25   Architect of the Capitol.  Again, you can make your payments

1    in a lump sum and free yourself from these restrictions on

2    you financially.  But until that amount is paid, you will

3    have to comply with those financial restrictions that I have

4    imposed and obligations that I imposed.

5            You do have 14 days from today's date to appeal

6    your conviction and your sentence to the Court of Appeals.

7    If you cannot afford to pay for a lawyer or if you cannot

8    afford to pay for those papers to be filed with the Court

9    letting the higher court know that you want to appeal, that

10   will be paid free of charge by the government.

11           Probation, anything else?

12           I will authorize the release of the report to the

13   appropriate entities and individuals who need it in order to

14   carry out the orders of the Court.

15           Also, since you live out in California, I will

16   authorize that the supervision of your probation be

17   transferred to the location where you reside.  But I will

18   maintain jurisdiction over your case.  So if you do violate,

19   you'll have to answer to me regarding the violation.

20           Anything else from Probation?

21           THE PROBATION OFFICER:  No, your Honor.  I think

22   that covers everything.

23           THE COURT:  Anything else from the Government?

24           MR. HAAG:  Nothing further, your Honor.  Thank

25   you.

24

```
1              THE COURT:  Defense, anything else?

2              MS. GUPTA:  No, your Honor.  Thank you.

3              THE COURT:  Mr. Ardolino, do you understand the

4    conditions I've imposed regarding your probation?

5              THE DEFENDANT:  Yes, I do, your Honor.

6              THE COURT REPORTER:  Judge, I apologize.  Just a

7    clarification.  Was the sentence 36 months' probation and

8    not incarceration?

9              THE COURT:  36 months' probation.  Yes.

10             Were there any charges that needed to be

11   dismissed?

12             MR. HAAG:  Yes, your Honor.  At this time, the

13   sentence being complete, the Government moves to dismiss

14   Counts 1, 2 and 3 of the information.

15             THE COURT:  Very well.  Those will be dismissed.

16             I will schedule this matter periodically for

17   review and make sure that he is in compliance.  So I will

18   schedule this matter for -- we can do it remotely, as long

19   as he's in compliance.  If he's not in compliance, then he

20   will have to appear here in Washington.  But as long as he

21   is in compliance, then for the reviews they can be done

22   remotely as we're doing now.

23             I'll set this matter for review on the 20th of

24   November at 12:00 noon.

25             MS. GUPTA:  Your Honor, if I may, I'm actually
```

 1    going to be out of the country.  Would it be possible --

 2              THE COURT:  When are you away?

 3              MS. GUPTA:  I am away from, I believe, the 15th or

 4    the 16th until the end of that week, the 26th.

 5              THE COURT:  You come back that week?

 6              MS. GUPTA:  Yes.  If we could schedule it for

 7    maybe the 30th.

 8              THE COURT:  I'll be in trial.  So I'll set this

 9    for the 11th of December at noon.  Is that good?

10              MS. GUPTA:  Yes, your Honor.  Thank you.

11              THE COURT:  If there's nothing else, thank you.

12              MS. GUPTA:  Thank you, your Honor.

13              (Proceedings concluded.)

14

15

16

17

18

19

20

21

22

23

24

25

1                    **<u>CERTIFICATE</u>**

2

3                    I, LISA EDWARDS, RDR, CRR, do hereby

4    certify that the foregoing constitutes a true and accurate

5    transcript of my stenographic notes, and is a full, true,

6    and complete transcript of the proceedings produced to the

7    best of my ability.

8

9

10                   Dated this 24th day of October, 2023.

11

12             <u>/s/ Lisa Edwards, RDR, CRR</u>
               Official Court Reporter
13             United States District Court for the
                 District of Columbia
14             333 Constitution Avenue, Northwest
               Washington, D.C. 20001
15             (202) 354-3269

16

17

18

19

20

21

22

23

24

25